IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| BARRY VASBINDER, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | )   Civil Action No. 09-1239 |
| | ) |
| ERIC K. SHINSEKI, | ) |
| Defendant. | ) |
| | ) |
| | ) |
| AMBROSE, Senior District Judge | ) |
| | ) |

**OPINION AND
ORDER OF THE COURT**

<u>Synopsis</u>

Plaintiff Barry Vasbinder asserts claims under the Age Discrimination in Employment Act of 1967, as amended, 29 U.S.C. §§ 621 et seq. ("ADEA") for age discrimination and retaliation against his employer, the Butler VA Medical Center, represented by Eric K. Shinseki, Secretary, Department of Veterans Affairs ("Defendant"). Defendant has moved for summary judgment dismissing the Complaint on the grounds that (1) Plaintiff has not established a *prima facie* case of age discrimination, and (2) Plaintiff has not raised an issue of fact with respect to the legitimate, non-discriminatory reason proffered by Defendant for its actions. For the reasons set forth below, I grant Defendant's motion for summary judgment in its entirety.

**I.      Applicable Standards**

In order to prevail on a motion for summary judgment, the moving party must demonstrate that "there is no genuine issue of material fact and. . .the moving party is entitled to judgment as a matter of law." <u>Jurimex Kommerz Transit G.M.B.H. v. Case Corp.</u>, 2007 WL

1

2153278, at *1 (3d Cir. July 27, 2007) (quoting Fed. R. Civ. P. 56(c)).  "[W]here the party opposing a motion for summary judgment bears the ultimate burden of proof, the moving party may discharge its initial burden of showing that there is no genuine of material fact by showing - that is, pointing out to the district court - that there is an absence of evidence to support the nonmoving party's case."  Player v. Motiva Enter., LLC, 2007 WL 2020086, at *9 n.4 (3d Cir. July 13, 2007).  "If the moving party has satisfied its initial burden, the nonmoving party must, in their opposition to the motion, identify evidence of record that creates a genuine issue of material fact."  Id.  Moreover, "[t]o defeat a motion for summary judgment, the non-moving party must 'do more than simply show that there is some metaphysical doubt as to the material facts.  In the language of the Rule, the non-moving party must come forward with specific facts showing that there is a genuine issue for trial.' "  Jurimex Kommerz Transit G.M.B.H., 2007 WL 2153278, at *1  (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986)).

## II.     Statement of Relevant Facts[1]

### Plaintiff's Employment History

Plaintiff began working for the Bulter VA Medical Center ("VAMC") in December of 1990.  Beginning in November 2000, Plaintiff was assigned to the position of Utility Systems Repairer Operator in the Boiler Plant.  On July 13, 2003, Plaintiff was promoted to the position of Utility Systems Repairer Operator Leader (Level 10).  As such, Plaintiff was required to have expertise in boiler plant operations.

The Butler VAMC facility employs a complex system of boiler plant operations, air conditioning operations, and utility systems operations.  The boiler plants have a capacity of

---

[1] Unless otherwise noted, the relevant facts are set forth in the parties' Concise Statements of Material Facts [Docket Nos. 31, 36, 37, 39], and have been agreed upon by the parties.

14,000 to 100,000 pounds of steam per hour. The Veterans Health Administrative Directive 2008-062, Boiler Plant Operations, specifically acknowledges that "[w]ithout constant and vigilant care, equipment involving combustion or steam production under pressure, such as boilers and pressure vessels, can explode causing significant property damage, interrupt medical center operations and the provision of patient care, as well as injury and fatalities." The directives further require that "there is continuous operator attendance within boiler plants and other locations outside the boiler plant generating high pressure steam. . . .Boiler plant operators must not leave any high pressure (above 15 psig) boiler plant unattended at any time, nor can they be relieved by unqualified persons."

Plaintiff acknowledges that safety is the first priority of boiler plant operations. He testified that when the boiler plant operator leader is the only one there during the day, there are no opportunities to take a break and that he has to be "alert" at all times, watching the pressure and listening for any unusual sounds. According to Plaintiff, failure to do so could result in the boiler blowing up and "kill[ing] you."

During the relevant time period, Calvin Sedgwick, the Utility Systems Operations Supervisor, was Plaintiff's immediate supervisor. On November 8, 2008, Plaintiff reported to work at about 7:45 a.m. He was the only person working at the boiler plant at that time. Sedgwick testified that he arrived at the boiler plant at approximately 9:00 a.m. to do some work on a freezer. He further testified that when he arrived, he found Plaintiff sleeping on the floor of the office, with a pillow, one or two blankets and an alarm clock nearby. When questioned by Sedgwick, Plaintiff admits that he told Sedgwick that he was "just relaxing."

Later that day, Sedgwick prepared a report of contact documenting the incident. A subsequent additional report of contact was prepared the following Monday with the assistance

of Human Resources, and signed by Sedgwick.  At the time of the incident, Jeff Heiger, Program Manager and Chief Engineer of Facilities Management, was traveling for training.  In his absence, Daniel Michalek, as supervisor in Facilities Management and Sedgwick's immediate supervisor, addressed the incident.

Based on the information provided to him by Sedgwick, Michalek prepared a report of contact.  The report stated that he held several discussions relating to the incident with Teneal Caw and Laurie Young of Human Resources, Sedgwick and Denise Tilko, and also spoke with Brian Marcyjanik regarding the safety implications of the incident.  While he believed Sedgwick's version of the incident, he related that "[t]here is apparently some level of 'bad blood' between Calvin Sedgwick and Mr. Vasbinder.  Calvin is his direct supervisor, so that is not totally unexpected.  I have also heard rumors that the remaining boiler plant operators do not want Mr. Vasbinder back as a work leader or co-worker, and are willing to sign a petition to not have him back.  This leads me to believe that this is not just Calvin Sedgwick acting on a personal vendetta."  In a Request for Disciplinary Action Memo, dated November 12, 2008, Sedgwick requested that Plaintiff's employment be terminated, based on the severity of the offense.  Michalek noted that "this was only a first offense for a ten (10) point preference veteran."[2]

Upon his return, Jeff Heiger reviewed a packet of information relating to the November 8, 2008 incident, including the reports of contact.  He did not speak with Plaintiff regarding the incident.  Because he was away at the time, he believed that Sedgwick and Michalek were

---

[2] Ginger Andrews, then acting president of the local chapter of the union, testified that she conducted her own investigation of the incident and found no first-hand evidence that Plaintiff had been sleeping on the job.  It is unclear from the deposition transcript submitted to the Court when this investigation occurred and what conclusions, if any, were shared with management.

responsible for initiating and following through with the disciplinary action. By letter dated November 17, 2008 (the "Removal Letter"), Jeff Heiger proposed that Plaintiff be terminated for sleeping on duty; endangering the safety of or causing injury to anyone on VA premises through carelessness or negligence; and deliberate failure or unreasonable delay in carrying out instructions. Plaintiff acknowledged receipt of the Removal Letter and was given fourteen days to reply.

On November 24, 2008, Plaintiff submitted a written statement in response to the Removal Letter. (Docket No. 32-20.) He explained that he was not sleeping on the job. After he took his 9:00 a.m. reading, he set the alarm to remind him to call his son at 10:30, then took off his right shoe to examine a toe that was bothering him. Sedgwick arrived while he was putting his shoe back on, and Plaintiff told Sedgwick that he was "relaxing."

Plaintiff also described the nature and history of his relationship with Sedgwick. According to Plaintiff, "he and I have had problems getting along with each other," and that Sedgwick "also had trouble getting along with other employees."[3] Sedgwick had applied for Plaintiff's work leader position, but had been told he was not qualified. After Jim Stockman was hired as Plaintiff's supervisor, Sedgwick "made life difficult for me by constantly speaking ill of me to Mr. Stockman. He fed into the fact that Mr. Stockman and I already didn't get along well. [He] took advantage of that fact and made our relationship worse by fabricating and exaggerating stories he relayed to Mr. Stockman." He further influenced Stockman into directing Plaintiff to no longer supervise the A/C shop or A/C employees and to stay in the boiler plant, taking away a

---

[3] Plaintiff testified that approximately one month before this incident, he met with Heiger to discuss the way in which Sedgwick had been treating Plaintiff and that Sedgwick wasn't allowing Plaintiff to perform his duties. Heiger responded that they should wait six months to see what happens due to the fact that Heiger was new to the position.

significant part of Plaintiff's responsibilities as work leader.[4]  When Sedgwick became a supervisor, he reiterated these instructions, and made degrading remarks and called Plaintiff names in front of his co-workers.  Plaintiff has complained to HR about Sedgwick's behavior to no avail.  Plaintiff filed grievances about his performance appraisals in 2007 and 2008.  Plaintiff feels that the incident "is clearly a case of pure and simple retribution for all that has happened between Mr. Sedgwick and me over the past five years.  It is very transparent that he is attempting to intimidate me and again he is creating a hostile work environment."  He further stated that "I am to the point that I no longer can trust anything that Mr. Sedgwick says or does.  I feel that this relationship is irreparable because he is unwilling to meet me halfway."

Richard Cotter, the Associate Director for the Butler VAMC, made the final decision with respect to Plaintiff's discipline.  Cotter testified that he was not aware of any "bad blood" between Plaintiff and Sedgwick.  Cotter decided not to terminate Plaintiff, testifying that "I felt that based on the information I had that it was a very serious offense that would, that could likely lead to termination.   However, Mr. Vasbinder had no previous documented personnel issues, so based on that, I decided that a change of assignment would be more appropriate than a termination."  By letter, dated January 7, 2009, Cotter informed Plaintiff that his proposed termination was mitigated to a reduction in grade and reassignment from the position of Boiler Plant Operator Leader to Maintenance Worker (Level 7).  Plaintiff acknowledged receipt of this letter.  After Plaintiff's demotion, Plaintiff admits that "the Utility Systems Repairer Operator Leader position was eliminated. . .and a position without any supervisory responsibilities was put in its place, with the result that Plaintiff was not replaced." (Pl. Opp. Br. at 5.)

---

[4] According to Plaintiff's testimony, these responsibilities in the A/C shop were then given to Dan Osborne, who was approximately twelve years younger than Plaintiff. (Pl. Opp. Br. at 6.)

On October 5, 2009, a Utility Systems Repair Operator position, with a Level 10 grade of pay, was announced.[5] Plaintiff applied and was interviewed, along with three other candidates, for this position. The interview was conducted on November 12, 2009 by a panel chosen by Jeffrey Heiger and consisting of Dan Michalek, Jeffrey White and Earl Collins. Michalek was chosen because he was the supervisor of the section and Earl Collins was chosen as the subject matter expert. All of the candidates were asked the same questions. The candidates' interviews were rated individually by the panel members on a scale of one to five, with five being the highest score.

Michalek testified that he is a "third level" supervisor to Plaintiff, and therefore, does not have much contact with him. Regarding Plaintiff's interview, he explained that "all of his responses were just very generic and general. And I don't think any, maybe one of them, but at the least very few directly applied to boiler plant operations."[6] By comparison, during Bruce Campbell's interview, "every single one of his answers was about – was related to a boiler plant or running a boiler plant or a problem he had at a boiler plant or fixing something at a boiler plant, and that was exactly what we were looking for." Earl Collins and Jeffrey White also agreed that Campbell was the most qualified for the job based on the answers that were given in the interview.

Bruce Campbell received the highest score from the panel and was selected by Jeffrey Heiger for the position. Bruce Campbell was born in December 1955, making him approximately one and a half years older than Plaintiff.

<hr>

[5] A vacancy for a Utility Systems Repairer Operator Leader position had previously been announced, was applied for by Plaintiff, but was subsequently cancelled. Since Plaintiff has withdrawn his claim with respect to that position, I do not need to discuss it further herein.

[6] Plaintiff testified that Michalek "did most of the talking" during Plaintiff's forty-five minute interview.

Handwritten notations on the Eligibility Certificates for the candidates stated "EEO Activity" followed by a "yes" with respect to Plaintiff and "unknown" with respect to the other candidates. (Docket No. 32-41, at 5-7.) These notations were made by Beth Holt, who attested that she added that information to copies of the Certificates provided to EEO investigators at their request in connection with their investigation of Plaintiff's August 12, 2009 EEO Complaint, and that such information was not maintained in the merit promotion folders. (Id. at 3-4.)

**Additional Evidence Relating to Age Discrimination**

Plaintiff's date of birth is June 23, 1957. Plaintiff testified that the VAMC has a policy "to get rid of older employees." He further testified that the policy is unwritten and began with buyouts of older employees. At the relevant time period, Plaintiff's co-workers in the boiler plant were Robert Tritch, age 60, William Bookhammer, age 53, Edward Kemper, age 56 and Shawn Gold, age 40. Of these five employees, all but one are older than Plaintiff. With respect to Tritch and Kemper, both of whom are older than Plaintiff, Plaintiff testified that they were treated with respect and permitted to do their jobs.

He identified the following employees of VAMC who discriminated against him based on age: Calvin Sedgwick, Jeffrey Heiger, Richard Cotter, Teneal Caw, Patricia Nealan and Daniel Michalek. Calvin Sedgwick was born on January 19, 1954, making him approximately three years younger than Plaintiff. In addition to the nature and history of Plaintiff's relationship detailed above, Plaintiff testified that he believed Sedgwick discriminated against him based on his age "[b]ecause he wants rid of older people in charge so he can boss the younger people around." He based that opinion on "[t]he way he acts, the way he treated me."

Jeffrey Heiger's date of birth is March 1, 1950, making him nearly seven years older than Plaintiff. Plaintiff testified that Heiger discriminated against him based on the VAMC policy of trying to get rid of older employers. Heiger had never made any negative statements regarding people over forty, nor done anything (apart from Plaintiff's demotion) to indicate that he had an issue with people over forty. Plaintiff admitted that he "[doesn't] know much about the man."

Richard Cotter's date of birth is February 5, 1951, making him approximately six years older than Plaintiff. Plaintiff testified that Cotter follows the VA policy of getting rid of older employees. Plaintiff further testified that Cotter got "rid of" Pat Wagner, John Pickerd and Al Alwine because of their ages, although Plaintiff admitted he had "no way of knowing what happens in other people's cases." The basis of Plaintiff's belief that Cotter discriminated against him is solely the fact of Plaintiff's demotion.

Teneal Caw is the Assistant Human Resources Officer, acted as an advisor to management on their options, sat in on some of the meetings to represent management, and assisted in locating a new position for Plaintiff. She explained to Plaintiff how the demotion would impact his pay. According to Plaintiff, Caw also supports the VAMC policy of getting rid of older employees.

Patricia Nealan is the Director of the Butler VMAC. Although Cotter was the deciding official regarding Plaintiff's demotion, he discussed his decision with Nealan. Nealan also signed the 3rd Step Grievance Decision letter, which informed Plaintiff that the decision to demote him would be sustained.

Daniel Michalek was born in June 1964, making him approximately seven years younger than Plaintiff. Apart from the VAMC's purported policy of getting rid of older employees to

save on pensions, Plaintiff only testified with respect to Michalek that Calvin Sedgwick reported to Michalek first with his story about Plaintiff sleeping on duty.

### III.  Defendant's Motion for Summary Judgment

Defendant has moved for summary judgment dismissing Plaintiff's Complaint in its entirety.  With respect to Plaintiff's claim of age discrimination, Defendant argues that (1) Plaintiff cannot establish a *prima facie* case because the circumstances of his demotion do not give rise to an inference of discrimination, (2) even if Plaintiff had demonstrated a prima facie case, Defendant had a legitimate, non-discriminatory reason for its actions, and (3) Plaintiff has submitted no evidence of pretext.  Defendant further argues that Plaintiff's claim for retaliation fails because Plaintiff cannot establish that Defendant's reason for its decision not to promote him was a pretext for unlawful retaliation.

###  A.       Age Discrimination (Count I)

The ADEA provides that "[i]t shall be unlawful for an employer . . . to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges or employment because of such individual's age."  29 U.S.C. § 623(a).  In this case, both parties agree that I should analyze Plaintiff's claims using the familiar burden-shifting framework set forth in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973). Under that framework, plaintiff first must establish a *prima facie* case of discrimination.  If the plaintiff succeeds, the burden of production then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action.  If the defendant meets this minimal burden, then the plaintiff must prove, by a preponderance of the evidence, that the articulated reason was mere pretext for discrimination.  <u>Id.</u> at 802; <u>Keller v. Orix Credit Alliance, Inc.</u>, 130 F.3d 1101, 1108 (3d Cir. 1997).  Throughout this analysis, however, the burden of

proving intentional discrimination rests with the plaintiff.  Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir. 1994); St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 509 (1993).

### 1.  Prima Face Case

To establish a *prima facie* case of age discrimination, a plaintiff must demonstrate:  (1) that he is a member of the protected class; (2) that he was qualified for the position in question; (3) that he suffered an adverse employment action; and (4) that the adverse action occurred under circumstances that create an inference of discriminatory motive.  See McDonnell Douglas, 411 U.S. at 802; Sarullo v. U.S. Postal Serv., 352 F.3d 789, 797 (3d Cir. 2003), cert. denied, 541 U.S. 1064 (2004).  For purposes of this motion, Defendant challenges only Plaintiff's ability to satisfy the fourth prong of the framework.

Defendant argues that Plaintiff cannot satisfy the fourth prong of his *prima facie* case because he cannot show that he was demoted under circumstances that give rise to an inference of discrimination.  (Def. Br. at 4.)  In support of its position, Defendant relies on the facts, set forth in more detail above, that: (1) four of Plaintiff's five co-workers were older than he, and Plaintiff admitted that two of them were treated with respect and permitted to do their jobs; (2) there is no evidence that Plaintiff was replaced by younger person; (3) indeed, Bruce Campbell, who was hired to fill the position which replaced Plaintiff's Leader position, was older than Plaintiff; and (4) Plaintiff has not adduced any evidence that younger, similarly-situated employees were treated more favorably than he was.  (Def. Br. at 7-8.)

Plaintiff counters that there is "a substantial amount of record evidence that supports an inference of discrimination."  (Pl. Opp. Br. at 5.)  This evidence is as follows:  (1) Sedgwick's remark, recounted by Plaintiff, that Sedgwick couldn't wait for several older employees to retire; (2) Sedgwick stripping Plaintiff of his supervisory duties and removing Plaintiff from the air

conditioning plant; (3) Sedgwick manufacturing the story of Plaintiff sleeping on the job; and (4) management's failure credibly to investigate or disbelieve Sedgwick's account of the incident.

The Third Circuit has "repeatedly emphasized that the requirements of the prima facie case are flexible and must be evaluated in light of the circumstances of the case before the court." Kuzdrowski v. Nicholson, 314 Fed. Appx. 410, 413 (3d Cir. 2008). "This applies with particular force to the fourth element of the prima facie case of discrimination." Id. Thus, in order to establish a prima facie case, Plaintiff must produce "evidence adequate to create an inference that an employment decision was based on an illegal discriminatory criterion." Roach v. American Radio Sys. Corp., 80 F. Supp.2d 530, 532 (W.D. Pa. 1999) (citing Pivirotto v. Innovative Sys., Inc. 191 F.3d 344 (3d Cir. 1999)).

Both parties cite the recent Supreme Court opinion in Staub v. Proctor Hospital, 131 S.Ct. 1186 (2011), as potentially relevant to the case at bar. In Staub, the plaintiff alleged that he was terminated from his employment with the defendant because of his supervisors' hostility toward the plaintiff's obligations in the military reserve, in violation of the Uniformed Services Employment and Reemployment Rights Act (USERRA). Id. at 1189. Plaintiff submitted evidence, by his own testimony and that of his co-workers, of frequent remarks by the supervisors expressing hostility to his military service and the supervisors' desire to get rid of him. Id. The supervisors issued an unwarranted corrective action against Plaintiff and then lied to management that plaintiff had violated the terms of the corrective action. Id. In reliance on his supervisors' statements, Defendant's management terminated plaintiff's employment. Id. The Supreme Court held that "if a supervisor performs an act motivated by antimilitary animus that is intended by the supervisor to cause an adverse employment action, and if that act is a

proximate cause of the ultimate employment action, then the employer is liable under USERRA." Id. at 1194.

Even assuming that the Supreme Court's holding on discrimination under the USERRA is applicable to claims under the ADEA, the evidence submitted by Plaintiff herein bears no resemblance to the quantity and quality of evidence submitted by the plaintiff in Staub. By contrast to the specific and frequent anti-military service comments made by the supervisors and testified to by the plaintiff's colleagues in Staub, Sedgwick's purported remark about looking forward to certain older employees' retirement, described without any identified time or context by Plaintiff, is inadequate to raise an inference of discriminatory motive. See Hicks v. Tech Indus., 512 F. Supp.2d 338, 349 (W.D. Pa. 2007) (stray comments allegedly reflecting age bias do not create an inference of discriminatory motive where the comments did not relate in any way to Plaintiff or Plaintiff's performance and there was no evidence that any of the individuals about whom the comments were made were discriminated against). This is especially so given the significant evidence in the record that Defendant did not discriminate. For example, Bruce Campbell, who was ultimately hired for the position applied for by Plaintiff, was older than Plaintiff. Indeed, all but one of Plaintiff's colleagues were older than he, and Plaintiff testified specifically with respect to two of these colleagues that they were treated with respect and permitted to do their jobs.

Rather, the evidence submitted by Plaintiff demonstrates only that there was significant personal animosity between Plaintiff and Sedgwick. Plaintiff's written statement in response to his removal letter, detailed above, explains the longstanding issues that Plaintiff had with Sedgwick, including Plaintiff's history of challenging his performance reviews and Sedgwick's alleged efforts to poison Plaintiff's relationship with his supervisor, Stockman. Plaintiff stated

that Sedgwick's lie about the sleeping incident was "clearly a case of pure and simple retribution for all that has happened between Mr. Sedgwick and me over the past five years." Actions taken as a result of personal animosity do not raise an inference of discrimination. See Baker v. City of Philadelphia, 2010 WL 5128649, at *2 (3d Cir. Dec. 16, 2010) (affirming summary judgment granting dismissal of racial discrimination claim on grounds that evidence of supervisor's dislike for plaintiff was insufficient to get to a jury absent some basis for concluding that her animosity was racially based); Farmer v. Camden City Board of Ed., 2005 WL 984376, at *13 n.18 (D.N.J. Mar. 28, 2005) ("Clash of personalities or personal dislike. . .is not sufficient to give rise to an inference of age discrimination.").

Plaintiff's argument, then, comes down to whether the Defendant's investigation of the November incident and decision to demote Plaintiff were "so far beyond the levels of incompetence and indifference normally allowed by the business judgment rule that the only conclusion that can be drawn is that that they were motivated by an unstated factor" - - age bias. (Pl. Opp. Br. at 12.) While I agree that Defendant's investigation of the incident does not appear to have been particularly rigorous, that alone does not raise an inference that the "unstated factor" was age discrimination. With respect to the other individuals who participated in the decision to demote Plaintiff, Plaintiff did not submit a shred of evidence, beyond his own belief, that their actions were motived by age discrimination. "Speculation is simply not evidence of discrimination." Hicks, 512 F. Supp.2d at 348.

Plaintiff has failed to submit evidence that raises an inference that Sedgwick or anyone else on behalf of Defendant was motivated by age discrimination. Accordingly, I find that Plaintiff has failed to demonstrate a *prima facie* case of age discrimination.

## 2. Pretext

Even if Plaintiff had demonstrated a *prima facie* case of age discrimination, his claim would still fail under the third prong of the <u>McDonnell Douglas</u> framework. Defendant has submitted evidence that Plaintiff was demoted because he was caught sleeping on the job. The burden then shifts to Plaintiff to submit evidence "from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." <u>Fuentes v. Perskie</u>, 32 F.3d 759, 765 (3d Cir. 1994). To meet this burden, Plaintiff relies on the same evidence submitted in support of his *prima facie* case.

Once again, this evidence fails to meet Plaintiff's burden. The overwhelming evidence, detailed above, demonstrates that, at best, Sedgwick misrepresented the November incident to management based on his personal dislike of Plaintiff. Management conducted an investigation of the incident and reviewed Plaintiff's personnel file. Based on these factors, management decided to demote Plaintiff, rather than terminate his employment as had been recommended by Sedgwick. While there may be factual disputes relating to the circumstances of his termination, Plaintiff's burden is demonstrate that "[Defendant's] reasons were a pretext for *discrimination*, not a pretext for something else." <u>Scott v. Allied Waste Svcs. of Bucks-</u>Mont, 2010 WL 5257643, at 4 (E.D. Pa. Dec. 23, 2010) (emphasis in original). He "must show more than that [Defendant's] decision to [demote] him was 'wrong or mistaken,' but must demonstrate that 'it was so plainly wrong that it cannot have been the employer's real reason.'" <u>Id.</u> at *5 (quoting <u>Baker v. United Defense Indus., Inc.</u>, 2010 WL 4997648, at *4 (3d Cir. Dec. 8, 2010)). Apart from Plaintiff's conclusory statements that Defendant had a policy of getting of older employees, Plaintiff offers not a shred of evidence that any of the decisionmakers had a discriminatory

reason for demoting him. "Simply because Plaintiff says he was discriminated against, however, does not make it so." <u>Hicks</u>, 512 F. Supp.2d at 349; <u>see also</u>, <u>Jackson v. Bob Evans- Columbus</u>, 2006 WL 3814099, at *7 (W.D. Pa. Dec. 22, 2006) ("unsupported/conclusory allegations of discrimination are not sufficient at the summary judgment stage to create a triable issue of fact"). Accordingly, even if Plaintiff had set forth a prima facie case of discrimination, Plaintiff has failed to raise an issue of fact as to whether Defendant's proffered reason for demoting him was a pretext for discrimination.

Defendant's motion for summary judgment dismissing Count I of the Complaint is granted.

### B.    Retaliation (Count II)[7]

The parties correctly agree that the same <u>McDonnell Douglas</u> burden-shifting analysis that applied to Plaintiff's discrimination claim applies to Plaintiff's retaliation claim. For purposes of this motion, Defendant does not dispute that Plaintiff has established a prima facie case of retaliation. (Def. Br. at 30, n. 3.) Defendant has set forth the reason why Plaintiff was not selected for the Operator position: because "the three-person interview panel determined that Bruce Campbell was the best qualified for the position based on the collective score he received from his interview, which was the highest out of the four candidates interviewed." (Def. Br. at 20.) The burden now shifts to Plaintiff to establish that Defendant's proffered reason is merely a pretext for discrimination. As stated above, in order to meet this burden, Plaintiff must submit evidence "from which a factfinder could reasonably either (1) disbelieve the employer's

---

[7] As previously stated, Plaintiff has withdrawn his retaliation claim concerning the Utility Systems Repairer Operator Leader position. (Pl. Opp. Br. at 16.) Accordingly, all that remains is Plaintiff's claim that he was not hired for the Utility Systems Repairer Operator position in retaliation for his protected activity.

articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." Fuentes, 32 F.3d at 765.

Plaintiff argues that "[t]he primary weakness in the Defendant's proffered reason is that Heiger, the individual who selected the interview panel, selected at least one individual with a known bias against Plaintiff." (Pl. Br. at 18.) The individual with a "known bias" against Plaintiff was Michalek. As detailed above, Michalek authored one of the Reports of Contact relied on to support Plaintiff's demotion, which expressed Michalek's belief in Sedgwick's account of the incident, mentions past incidents between Plaintiff and Sedgwick and purported statements by Plaintiff's co-workers that they did not want him back, and recommended that Plaintiff's employment be terminated.

Apart from Plaintiff's disagreement with the substance of Michalek's report of contact, Plaintiff has submitted no evidence which raises an issue of fact as to the legitimacy of Defendant's reason for failing to promote Plaintiff. Michalek was chosen to sit on the panel because he was the supervisor of the section. All the candidates were asked the same questions, and while Plaintiff finds it "implausible" that another candidate would provide better answers than he did, he admits that he did not know the answers that were provided by the other candidates. (Pl. Opp. Br. at 19.) Further, the other two members of the panel, Collins and White, agreed that Campbell was the most qualified for the job based on the answers that were given in the interviews. Plaintiff does not claim that either of those individuals was biased against him. All three panel members testified that they had no knowledge of Plaintiff's EEO activity at the time they evaluated the candidates, and Beth Holt's uncontroverted testimony states that the handwritten notations on the candidates evaluation sheets relating to EEO activity

were added only to copies submitted to the EEO and at the EEO's specific request, and were not contained in the candidates' personnel files.

Once again, Plaintiff has failed to submit any evidence, apart from his own unsubstantiated speculation, that would cast doubt on the legitimate reason provided by Defendant. Accordingly, I grant summary judgment dismissing Plaintiff's claim of retaliation.[8]

## Conclusion

Based on the foregoing, Defendant's motion to for summary judgment is GRANTED.

## ORDER OF COURT

Having carefully considered Defendant's motion for summary judgment [Docket Nos. 29-32, 39, 40] and Plaintiff's opposition thereto [Docket Nos. 34-38, 41], it is hereby ORDERED that Defendant's motion for summary judgment is GRANTED.

Dated: May 10, 2011

BY THE COURT:

/s/Donetta W. Ambrose
Donetta W. Ambrose,
Senior U.S. District Judge

---

[8] Defendant also has moved for summary judgment on the issue of Plaintiff's right to recover compensatory damages for emotional distress under the ADEA and his right to a jury trial. In response, Plaintiff has withdrawn his claim for compensatory damages for emotional distress and for a jury trial. (Pl. Br. at 35.) In any event, because I have granted summary judgment dismissing Plaintiff's claims, those issues are now moot.